IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No: 21-CR-25 |
| | ) | |
| v. | ) | JUDGE MOSS |
| | ) | |
| JORDEN MINK | ) | FILED UNDER SEAL |

## MOTION FOR REVOCATION OF DETENTION ORDER

AND NOW COMES, the Defendant, Jorden Mink, by through his counsel, Michael E.

Moser, Esquire, filing the within Motion for Revocation of Detention Order, and in support

thereof, avers as follows:

**I.    PROCEDURAL HISTORY**

1.    On January 18, 2021, Jorden Mink was arrested in Pittsburgh, Pennsylvania

pursuant to a criminal complaint filed in the District Court for the Western District of

Pennsylvania at 21-MJ-105 charging Mr. Mink with the following offenses:

| | | | |
|---|---|---|---|
| COUNT 1 | 18 U.S.C. 1752(a)(1), (2), (4) and (b)(1)(A) | - | Unlawful Entry on Restricted Building or Grounds While Using or Carrying a Deadly Weapon |
| COUNT 2 | 40 U.S.C. 5104(e) | - | Unlawful Injury to Property On Capitol Grounds |
| COUNT 3 | 40 U.S.C. 5104(e), 5104(e)(2)(D), (F), (G) | - | Violent Entry, Disorderly Conduct, Physical Violence on Capitol Grounds |
| COUNT 4 | 18 U.S.C. 1361 | - | Destruction of Government Property Valued at Over $1,000 |

-1-

| COUNT 5 | 18 U.S.C. 641 | - | Theft of Government Property |
| COUNT 6 | 18 U.S.C. 2(a) | - | Aiding and Abetting Theft of Government Property |

2.    On January 19, 2021, the United States Attorney's Office for the Western District of Pennsylvania filed a Request for Detention of Mr. Mink alleging, *inter alia*, that Mr. Mink was a danger to the community; that Mr. Mink posed a serious risk of flight, and that Mr. Mink posed a serious risk of obstructing justice and/or of intimidating or injuring prospective witnesses or jurors in this case.

3.    On January 27, 2021, an Indictment was filed in the United States District Court for the District of Columbia charging Mr. Mink with the following:

| COUNT 1 | 18 U.S.C. 1512( c )(2); 18 U.S.C. 2 | - | Obstruction of an Official Proceeding; Aiding & Abetting |
| COUNT 2 | 18 U.S.C. 641; 18 U.S.C. 2(a) | - | Theft of Government Property;  Aiding & Abetting |
| COUNT 3 | 18 U.S.C. 1361 | - | Destruction of Government Property |
| COUNT 4 | 18 U.S.C. 1752(a)(1), (2), (4) and (b)(1)(A) | - | Unlawful Entry on Restricted Building or Grounds While Using or Carrying a Deadly Weapon |
| COUNT 5 | 40 U.S.C. 5104(e)(2)(D) | - | Disorderly Conduct In a Capitol Building |
| COUNT6 | 40 U.S.C. 5104(e)(2)(F) | - | Physical Violence on Capitol Grounds |

-2-

| COUNT 7 | 40 U.S.C. 5104(e)(2)(G) | - | Parading, Demonstrating, or Picketing in a Capitol Building |

4.     On January 29, 2021, a detention hearing was conducted before Magistrate Judge Lisa Pupo Lenihan, after which Judge Lenihan ordered Mr. Mink to be held without bond pending trial of his case "on the basis of danger and obstruction of justice".  January 29, 2021 Detention Hearing Transcript - p. 87 (A copy of the January 29, 2021 Detention Hearing Transcript hereinafter referred to as "Transcript"] is attached hereto as Exhibit "A")

5.     On March 16, 2021, Mr. Mink was arraigned on a Superseding Indictment charging Mr. Mink with the following:

| COUNT 1 | 18 U.S.C. 1512( c )(2); 18 U.S.C. 2 | - | Obstruction of an Official Proceeding; Aiding & Abetting |

| COUNT 2 | 18 U.S.C. 641; 18 U.S.C. 2(a) | - | Theft of Government Property;  Aiding & Abetting |

| COUNT 3 | 18 U.S.C. 1361 | - | Destruction of Government Property |

| COUNT 4 | 18 U.S.C. 1752(a)(1), (2), (4) and (b)(1)(A) | - | Entering or Remaining in Restricted Building or Grounds with  a Deadly or Dangerous Weapon |

| COUNT 5 | 40 U.S.C. 5104(e)(2)(D) | - | Disorderly Conduct In a Capitol Building |

| COUNT 6 | 40 U.S.C. 5104(e)(2)(F) | - | Act of  Physical Violence on Capitol Grounds |

| COUNT 7 | 40 U.S.C. 5104(e)(2)(G) | - | Parading, Demonstrating, or Picketing in a Capitol Building |
| COUNT 8 | 18 U.S.C. 231(a)(3) | - | Civil Disorder |
| COUNT 9 | 18 U.S.C. 111(a)(1) and (b) | - | Assaulting, Resisting, or Impeding Officers Using a Dangerous Weapon |
| COUNT 10 | 18 U.S.C. 111(a)(1) | - | Assaulting, Resisting, or Impeding Certain Officers |

6.      Status Conferences have been conducted before this Honorable Court on

March 16, 2021,  March 24, 2021,  April 21, 2021, July 13, 2021, August 16, 2021, September

14, 2021, at which Mr. Mink has waived his right to a speedy trial.

7.      A status conference is scheduled for October 29, 2021.

## II.      ARGUMENT PURSUANT TO BAIL REFORM ACT FACTORS

### A.      LEGAL STANDARD

8.      The Bail Reform Act of 1966 states, "[t]he law requires reasonable  assurance [,]

but does not demand absolute certainty" that a defendant will comply with release conditions

because a stricter regime "would be only a disguised way of compelling commitment in advance

of judgment." *United States v. Alston*, 420 F.2d  176, 178 (D.C. Cir. 1969)

9.      The Bail Reform Act provides that the government may seek pretrial detention in

one of two scenarios. First, the government may seek pretrial detention if the case involves any

of an enumerated set of offenses, including a crime of violence or a felony that involves the use

of a dangerous weapon. 18 U.S.C. § 3142(f)(1). In determining whether an offense is a crime of

violence, courts look to the elements of the offense, not the real world conduct. *United States v.*

-4-

*Singleton*, 182 F.3d 7, 11 (D.C. Cir. 1999).

10.     Second, the government may seek pretrial detention if the case involves a serious

risk of flight, obstruction of justice, or witness intimidation. 18 U.S.C. § 3142(f)(2).

11.     If pretrial detention is available, the judicial officer shall, upon a motion of the

government, hold a hearing to determine whether there are any conditions or combination of

conditions that will reasonably assure the appearance of the defendant as required and the safety

of any person in the community. 18 U.S.C. § 3142(f)(1).

12.     After the hearing, a "judicial officer shall order the pretrial release of the

[defendant] . . . unless the judicial officer determines that such release will not reasonably assure

the appearance of the [defendant] as required or will endanger the safety of any other person in

the community." 18 U.S.C. § 3142(b), (e)(1).

13.     To determine whether conditions exist that will reasonably assure the appearance

of the defendant as required and the safety of any person in the community, the judicial officer

shall consider four factors:

(1) "the nature and the circumstances of the offense charged,"

(2) "the weight of the evidence against the person,"

(3) "the history and characteristics of the person," and

(4) "the nature and seriousness of the danger to any person or the community that would
be posed by the person's release." 18 U.S.C. § 3142(g)(1)  (4).

A finding that a defendant poses a risk of flight must be supported by a preponderance of the

evidence. *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987). And a finding that a

defendant poses a danger to the community must be supported by clear and convincing evidence.

18 U.S.C. § 3142(f)(2)(B).

      **B.**     **DEFENDANT DOES NOT POSE A RISK OF FLIGHT**

      14.     On January 18, 2021, Jorden Mink was arrested in Pittsburgh, Pennsylvania pursuant to a criminal complaint filed in this matter.

      15.     The evidence presented at the January 29, 2021 Detention Hearing Transcript showed that on January 18, 2021, Mr. Mink, upon learning that law enforcement officers were at his home, indicated to his girlfriend that he was going to come home from his storage unit music studio immediately, at which time he was taken into custody at the storage unit music studio without incident. (Transcript pp.15-16, 52)

      16.     The evidence presented at the January 29, 2021 Detention Hearing showed that in the days leading up to January 18, 2021, despite his awareness that he was probably under investigation, Mr. Mink remained in Allegheny County and spent his time at his place of employment, his music studio, at a doctor appointment, and at his home. (Transcript pp.15-17, 32-34, 49-53)

      17.     The evidence presented at the January 29, 2021 Detention Hearing showed that law enforcement made no efforts to contact, speak to, or meet with Mr. Mink before January 18, 2021, which was the day of his arrest. (Transcript pp.32-34)

      18.     The evidence presented at the January 29, 2021 Detention Hearing showed that on January 18, 2021, once Mr. Mink was advised that law enforcement officers were at his house, Mr. Mink advised his fiancee that he was returning home. . . to the house where law enforcement was waiting for him.  (Transcript pp.15-16, 52)

19.     The evidence presented at the January 29, 2021 Detention Hearing showed that on January 18, 2021, law enforcement arrived at Mr. Mink's storage unit music studio before Mr. Mink was able to return to his home, and placed him under arrest.  (Transcript pp.15-16, 52)

20.     The evidence presented at the January 29, 2021 Detention Hearing showed that on January 18, 2021, Mr. Mink was arrested without incident at the storage unit music studio, and that Mr. Mink did not flee, attempt to flee, or resist arrest in any way. (Transcript pp.15-16, 52)

21.     Mr. Mink was fully cooperative with law enforcement on January 18, 2021, which was the day of his arrest.

22.     Mr. Mink's criminal history does not include any arrests or convictions for assault on police officers, flight from apprehension, fleeing police, or resisting arrest.

### C.     DEFENDANT DOES NOT POSE A RISK OF NON-APPEARANCE AT COURT PROCEEDINGS

23.     Between 2012 and 2020, Mr. Mink's record shows eight (8) criminal charges; three (3) of which resulted in convictions for misdemeanor offenses, three (3) of which resulted in convictions for summary citation level offenses, and two (2) of which were completely dismissed.

24.     Between 2012 and 2020, Mr. Mink's record shows only one instance in which Mr. Mink failed to appear for Court. That single instance of non-appearance was in 2013 when Mr. Mink was mistaken about his about his court date and failed to appear.  Once he became ware that he had missed a court date, Mr. Mink immediately turned himself in, and his case was resolved as summary citation level offenses within days of his self surrender.

25.     Mr. Mink never failed to appear for a court proceeding after that single instance in 2012.  In fact, on December 10, 2013, almost exactly one year later, Mr. Mink appeared for court on the day that his first and only son was born, even when his son was fighting for his life in intensive care, Mr. Mink appeared for Court.  Mr. Mink appeared for every single Court proceeding after 2012.

26.     Mr. Mink is far from perfect and admits that he has made mistakes and been involved in criminal activity in his lifetime.  But a review of Mr. Mink's record shows that he has always paid his court costs and fines, and has consistently appeared for court proceedings.

27.     Mr. Mink is not a risk of non-appearance for court proceedings.

**D.     DEFENDANT DOES NOT POSE A RISK OF OBSTRUCTING JUSTICE**

28.     Between 2012 and 2020, Mr. Mink's record shows eight (8) criminal charges; three (3) of which resulted in convictions for misdemeanor offenses, three (3) of which resulted in convictions for summary citation level offenses, and two (2) of which were completely dismissed.

29.     Mr. Mink's record is devoid of any charges for obstruction of justice or any similar or analogous offenses.

30.     At the January 29, 2021 detention hearing, Magistrate Judge Lenihan made a finding that Mr. Mink had obstructed justice because "(his) phone has now mysteriously disappeared".   The allegedly missing phone was the sole basis articulated by Magistrate Judge Lenihan for her finding that Mr. Mink had obstructed justice.

31.     There was no evidence that any person from any court, from law enforcement, or any other entity ever asked Mr. Mink for any phone between January 6, 2021 and January 18,

2021.

32.     There was no evidence presented at the January 29, 2021 detention hearing that Mr. Mink was even aware that he might be under investigation by law enforcement in the days until closer to January 18, 2021, which was twelve (12) days after the January 6, 2021 events in Washington D.C.

33.     There was no evidence presented at the January 29, 2021 detention hearing that Mr. Mink was directed to surrender or preserve any telephone or any other devices.

34.     Mr. Mink, between January 6, 2021 and January 18, 2021, was under no legal obligation to preserve or maintain possession of any of his belongings for law enforcement to examine, especially when law enforcement had made no efforts to contact or speak with Mr. Mink between January 6, 2021 and January 18, 2021.

35.     Magistrate Judge Lenihan erred in finding that Mr. Mink had obstructed justice simply because he was not in possession of a telephone that the Government thinks he possessed.

36.     The Government has presented no evidence that Mr. Mink contacted, communicated with, or otherwise interacted with any witness to this case.

37.     Mr. Mink did not obstruct justice and he does not pose a risk of obstructing justice if he is released on bond.

**E.     THE COURT CAN IMPOSE CONDITIONS OF RELEASE THAT WILL REASONABLY ASSURE THE SAFETY OF ANY PERSON IN THE COMMUNITY**

38.     To determine whether conditions exist that will reasonably assure the safety of any person in the community, the judicial officer shall consider four factors:

(1) "the nature and the circumstances of the offense charged,"

(2) "the weight of the evidence against the person,"

(3) "the history and characteristics of the person," and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)  (4).

A finding that a defendant poses a danger to the community must be supported by clear and convincing evidence. 18 U.S.C. § 3142(f)(2)(B).

> **i.      "the nature and the circumstances of the offenses charged"**

39.     Mr. Mink acknowledges that the offenses charged are serious and he takes these matters seriously.

40.     Mr. Mink is charged with intentionally breaking two windows at the Capitol Building, and with assaulting police officers.

41.     Mr. Mink is not alleged to have caused bodily injury of any kind to any police office or person.

42.     Mr Mink is not alleged to have held any leadership role in the January 6, 2021 events at the Capitol Building.

43.     There has been no evidence presented that Mr. Mink was, is, or has been a part of any group or organization alleged to have been involved with the planning or execution of the January 6, 2021 events at the Capitol Building.

44.     There has been no evidence presented that Mr. Mink traveled with any other persons to the Washington D.C. on January 6, 2021.

45.     The evidence, viewed in a light most favorable to the Government at this point, alleges that Mr. Mink used a baseball bat to break windows and a flagpole-like object to strike police officers' shields.

46.     Mr. Mink did not possess or use any knives, firearms, or incendiary devices on January 6, 2021.

47.     The charges and alleged conduct, while serious, do not amount to clear and convincing evidence that Mr. Mink, 10 months after the alleged conduct, poses a danger to the community.

48.     The charges and alleged conduct, while serious, do not prove that no conditions exist that will reasonably assure the safety of any person in the community.

     **ii.     "the weight of the evidence against the person"**

49.     Mr. Mink acknowledges that the offenses charged are serious and he takes these matters seriously.

50.     Mr. Mink acknowledges that the weight of the evidence is substantial.

51.     The weight of the evidence to support the charges, while serious, does not establish by clear and convincing evidence that Mr. Mink, 10 months after the alleged conduct, poses a danger to the community.

52.     The weight of the evidence to support the charges, while serious, does not prove that no conditions exist that will reasonably assure the safety of any person in the community.

     **iii.     "the history and characteristics of the person"**

53.     Mr. Mink acknowledges that he has had arrests and convictions for misdemeanor and citation level offenses in the past.

-11-

54.     Mr. Mink acknowledges that he has struggled with chemical dependence and addiction in the past.

55.     Mr. Mink's criminal history is fairly summarized as follows:

| DATE | OFFENSE OF CONVICTION | SENTENCE |
|---|---|---|
| June 1, 2012 | Disorderly Conduct (Summary Citation) | Fine and Court Costs (Paid on Full) |
| May 17, 2013 | Simple Assault (Misdemeanor) Theft (Misdemeanor) | 6 Months Probation (Successfully completed; All costs paid) |
| October 7, 2013 | Driving Under the Influence of Alcohol | 6 Months Probation (Successfully completed; All costs paid) |
| August 24, 2014 | Disorderly Conduct (Summary Citation) | Fine and Court Costs (Paid on Full) |
| September 1, 2017 | Driving Under the Influence of Alcohol | 6 Months Probation with intermediate punishment |
| May 20, 2019 | Simple Trespass (x2) (Summary Citations) | Fine and Court Costs (Paid on Full) |

56.     Mr. Mink's criminal history includes only one conviction for a crime of violence of any kind, which is a misdemeanor simple assault conviction from 2013.

57.     Mr. Mink's criminal history tracks with his history of struggles with addiction, with offense conduct for his most recent conviction (Simple Trespass (x2) (Summary Citations) being in May 2019.

58.     Mr. Mink became clean and sober in December 2019 and remained clean and sober continuously to the present time.

59.     Mr. Mink has no convictions of any kind since he became sober in December 2019.

60.     The January 29, 2021 Detention Hearing included REDACTED ██████████████████████████████████████████████████████████████████ ████████████████████

61.     REDACTED ████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████

62.     REDACTED ██████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

63.     The January 18, 2021 search of the Mr. Mink's rented home reveals that no drugs, contraband, paraphernalia, or any illegal items were found in the parts of the home that the Mink's were able and permitted to access.

64.     The evidence presented at the January 29, 2021 Detention Hearing showed that Mr. Mink's social media content contained exponentially more content about family, music, healthy living and celebration of sobriety than political content.

65.     Mr. Mink has a stable and loving family.

66.     Mr. Mink has been drug and alcohol free since December 2019 - nearly two years.

67.     Mr. Mink has a loving fiancé and an eight year old son for whom he is the primary support.

68.     Mr. Mink has a consistent history of employment and has employment available to him if released.

69.     The history and characteristics of Jorden Mink do not allow a finding by clear and convincing evidence that Mr. Mink, 10 months after the alleged conduct, poses a danger to the community.

70.     The history and characteristics of Jorden Mink make it clear that this Honorable Court can fashion conditions of release that will reasonably assure the safety of any person in the community.

**iv.     "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)–(4).**

71.     In *United States v. Munchel*, a recent Capitol rioter case decided by the D.C. Circuit Court of Appeals, the Court held that the District Court should consider whether a defendant poses an articulable future threat to the community in view of his conduct on January 6, 2021, and the particular circumstances of January 6, 2021.

72.     The Court went on to find that the District Court based its dangerousness determination on a finding that alleged conduct indicates that he is willing to use force to promote his political ends," and that "[s]uch conduct poses a clear risk to the community." *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021).  Munchel was also in possession of a dangerous weapon (a taser gun) as he rummaged through the Senate Chamber, with zip ties attached to his belt.

73.     The D.C. Circuit Court of Appeals found that this did not demonstrate a future threat to the community, remanded the case back to the District Court where Munchel was

ultimately released on conditions.

74.     Mr. Mink's alleged conduct on January 6, 2021 is very serious, but does not involve injury to any person.

75.     Mr. Mink's alleged conduct on January 6, 2021 is very serious, but does not involve membership or leadership in any group or role in organizing the January 6, 2021 events.

76.     A finding of dangerousness must be predicated on a concrete  determination that the defendant poses a continued, "identified and articulable threat to the community…" Munchel, 2021 WL 1149196, at *4

77.     Magistrate Judge Lenihan failed to support her decision to detain Mr. Mink with a finding that Mr. Mink posed an articulable future threat to the community in view of his conduct on January 6, 2021 and the particular circumstances of January 6, 2021.

78.     Magistrate Judge Lenihan failed to articulate or support factually her finding that Mr. Mink posed a threat to the community, instead merely asserted that Mr. Mink's alleged conduct on January 6, 2021 indicated "a complete and total disregard for the Government and for the rule of law" (p.86)

79.     There in insufficient evidence to prove by clear and convincing evidence that Mr. Mink is a danger to the community.

80.     Even in light of the seriousness of Mr. Mink's alleged conduct, this Honorable Court can fashion conditions of release that will reasonably assure the safety of any person in the community.

## F.     DEFENDANTS WHO ARE SIMILARLY SITUATED HAVE BEEN RELEASED ON BOND

81.     The vast majority of charged Capitol riot men have been released. A

sampling of some detained include:

> United States v. McCaughey, III, 21-CR-040-1, at 11 (D.D.C. Apr. 7, 2021) (government emphasizing defendant's "intent to injure" an officer who he had pinned against a door using a stolen riot shield as grounds for pretrial detention);

> United States v. Pezzola, 2021 WL 1026125, at *9 (Kelly, J.) (ordering pretrial detention for defendant "engaged in planning and coordination with other Proud Boys, including by arranging concealed means of communicating by radio during the riot");

> United States v. Chrestman, 2021 WL 765662, at *2–3 (ordering pretrial detention for defendant who marched with the Proud Boys to the Capitol, urged the crowd to "take" the Capitol, and then "led his [four] co-conspirators in deliberate efforts to prevent Capitol Police from closing the barriers").

> United States v. Webster, 21-CR-208  (D.D.C.) (defendant struck officer with flagpole multiple times, tackled officer, and pinned officer to ground while trying to remove officer's shield and gas mask); Statement of Facts, ECF No. 1-1 & Min. Entry (Apr. 8, 2021).

> United States v. Sabol, 21-CR-35-1 (D.D.C.) (defendant took officer's baton and dragged officer down steps); Statement of Facts, ECF No. 1-1 & Min. Entry (Apr. 5, 2021),

> United States v. McKellop, 21-CR-268 (D.D.C.) (defendant pushed officers back with his hands, threw a bottle at another officer, and shoved flagpole into officer's face); Statement of Facts, ECF No. 1-1 & Min. Entry (Mar. 10, 2021),

> United States v. Stager, 21-CR-35-2 (D.D.C.) (defendant struck officer on the ground with flagpole); Statement of Facts, ECF No. 1-1 & Min. Entry (Mar. 15, 2021),

> United States v. Foy, 21-CR-108-1 (D.D.C.) (defendant lifted hockey stick above his head and struck an officer lying on the ground multiple times); Statement of Facts, ECF No. 1-1 & Rule 5(c)(3) Docs., ECF No. 6,

> United States v. Jenkins, 21-CR-245 (D.D.C.) (defendant threw nine items at officers, including three stick-like objects, a wooden dresser drawer, and a flagpole); Aff. in Supp. of Crim. Compl. & Arrest Warrant, ECF No. 1-1 & Min. Entry (Feb. 9, 2021),

> United States v. Lang, 21-CR 53 (D.D.C.) (defendant swung bat at officers' shields); Statement of Facts, ECF No. 1-1 & Min. Entry (Mar. 9, 2021),

United States v. Mellis, 21-CR-206 (D.D.C.) (defendant repeatedly struck or attempted to strike officers' necks between their helmets and body armor).

82.     Mr Mink's actions are distinguishable from many of these cases, where he is not alleged to have caused any injury to any persons

83.     Many defendants with charges that actually allege violence have been released:

United States v. Leffingwell, 21-CR-5 (D.D.C.) (defendant repeatedly punched officer with closed fist in attempt to push past wall of officers); Statement of Facts (Jan. 18, 2021), ECF No. 1-1 & Min. Entry (Jan. 19, 2021),

United States v. Gossjankowski, 21-CR-123 (D.D.C.) (defendant activated taser within tunnel multiple times as he pushed towards the police line); Statement of Facts (Feb. 9, 2021), ECF No. 1-1 & Min. Entry (Feb. 17, 2021),

United States v. Blair, No. 21-CR-186 (D.D.C.) (defendant struck an officer in the chest with a lacrosse stick; Statement of Facts (Jan. 13, 2021), ECF No. 1-1 & Min. Entry (Mar. 2, 2021),

United States v. Sanford, 21-CR-86 (D.D.C.) (defendant hurled a fire extinguisher that struck one officer and ricocheted off two other officers' helmets); Statement of Facts (Feb. 16, 2021), ECF No. 1-1 & Min. Entry (Apr. 9, 2021),

United States v. Coffee, 21-MJ-236 (D.D.C.) (defendant pushed a crutch into an officer's body at the archway to the tunnel and then charged at several officers in the tunnel with the crutch).

84.     Some defendants have been given favorable consideration by expressing remorse: Specifically, See, e.g., *United States v. Cua*, 2021 WL 918255, at *7  8  (D.D.C. Mar. 10, 2021) (Moss, J.) (weighing defendant's deep remorse and regret in favor of pretrial release). Cua climbed scaffolding affixed to the observation deck that had been constructed for President Biden's forthcoming inauguration and then headed toward the Capitol building. Cua next breached the Capitol building and marched through it carrying and twirling a black  baton. Cua made his way to the foyer of Senate Chamber, where he and a group of others shoved aside an

officer guarding the entrance, and then entered the Senate Chamber. Aside from his use of

physical force and violence to gain entry to the Senate Chamber, Cua's public social posts were

very graphic, and his Parler posts included the following:

> December 19, 2021
>> On JAN 6th congress will open their blinds and see MILLIONS OF ANGRY
>> #PATRIOTS. OPEN CARRY MISSON. If they vote for sleepy joe and commie
>> KAMALA, we BREAK DOWN THEIR DOORS AND TAKE OUR COUNTRY
>> BACK BY FORCE

> January 1, 2021
>> I hear chatter of DC having "firearm checkpoints", where they will stop
>> you, search your car (without a warrant) and arrest you for having a gun. Which
>> is an unconstitutional felony in DC. Bring other weapons if you prefer, like pepper
>> spray, tasers, baseball bats, whatever you want. Although may I remind you that
>> that is EXACTLY what they want from us, to lay down our weapons and be sheep!
>> They know they cannot control us if we are armed and dangerous! I don't know
>> who needs to hear this, but they can't arrest all of us. Do not back down and do
>> not be discouraged. Show up and be ready to fight. This really is out #1776. Please echo
>> to spread awareness.

> January 7, 2021
>> The tree of liberty often has to be watered from the blood of tyrants. And
>> the tree is thirsty. Violent protests against the capital (NOT SMALL BUSINESS'S) are
>> well within our constitutional rights
>> Dear Swamp Rats, The events at the capital were a reminder that WE THE
>> PEOPLE are in charge of this country and that you work for us. There will be no
>> 'warning shot' next time.
>> Everyone who works in congress is a traitor to the people and deserves a
>> public execution. Id. at 1–3.

Although less public, Cua's Instagram direct messages expressed similar, violent sentiments:

> November 9, 2020
>> I'm trying to find an AR to buy under the table. Know anybody?

> December 14, 2020
>> I don't want to sit here in GA and watch I want to fight

> December 22, 2020
>> [T]his [January 6, 2021] could possibly be one of the most important days in
>> American history ... because we can storm the freaking senate/house ... That's
>> why I keep saying to bring guns ... Holding signs is useless ... We have to
>> forcefully take our freedom back on Jan. 6

January 7, 2021
  In response to a message stating "You know if trump really doesn't get in because of the traitors all I can say is he exposed the swamp," Cua writes "If Trump doesn't get Im we will be back in DC for a blood bath"

January 8, 2021
  Trump or not, our fight against the government is far from over ... I would lay down my life for him but I'm gonna keep fighting

January 9, 2021
  I want a bloody war I'm ready to start shooting and I'm ready to die before I watch America crash and burn ... I'll be on the front lines ... I want to lock the swamp rat tyrants in the capital and burn the place to the ground
  Dkt. 23-1 at 5, 6, 9, 12 (Ex. 1).

85.  Mr. Cua's actions at the Capitol involved violence, as do Mr. Mink's alleged actions.

86.  Mr. Cua's social media posts were truly violent in nature, and demonstrated a level of interest in and dedication to his political cause than do the social media posts of Mr. Mink.

87.  Mr. Mink is fully prepared to make a statement to the Court of his remorse for his actions on January 6, 2021, and to disavow politically motivated violence or criminal activity of any kind.

88.  Mr. Mink is prepared to make a statement to the Court that he will abide by all conditions of his release that are imposed by this Honorable Court.

89.  Mr. Mink, in his criminal history and lifetime, has no history or instance of behaving violently or being uncooperative with law enforcement in any way.  A review of his criminal history, including his conduct when arrested in the instant matter, shows zero evidence that Mr. Mink has ever been anything other than respectful and cooperative to law enforcement.

-19-

90.     Munchel advises that the district court consider "the specific circumstances that made it possible, on January 6, 2021 for [the defendant] to threaten the peaceful transfer of power."  In the instant case, it is clear that the nature of the January 6, 2021 events as a whole caused behavior my many, including possibly Mr. Mink, that was inconsistent with their behavior in every other moment of their lives.  As such, while the alleged conduct on January 6, 2021 was very serious, it is not indicative of a risk that such behavior is likely to occur in the future.

91.      An analysis of the offense conduct charged and of the history and characteristics of Mr. Mink compels the conclusion that this Honorable Court can fashion conditions or combination of conditions that will reasonably assure the appearance of the Mr. Mink as required and the safety of any person in the community.

## III.    MR. MINK'S PRE-TRIAL DETENTION RESTRICTS HIS ABILITY TO REVIEW RULE 16 DISCOVERY MATERIALS AND EVALUATE HIS CASE.

91.     This Honorable Court is well aware of the challenges faced by Mr. Mink to date in being able to access and review his Rule 16 discovery materials.

92.     Mr. Mink was afforded limited access to the Governments first two productions of discovery material, and has still been unable to review evidence that the Government produced on September 1, 2021 and was provided to Central Treatment Facility in mid-September 2021 by the undersigned counsel.

93.     It appears as though Central Treatment Facility has limited number of laptop computers for use by inmates to review their discovery materials.

94.     Additionally, the undersigned has been advised by the Government on October 20, 2021 of another very large supplemental production of discovery by the Government via a file sharing platform.

95.     Counsel has been advised that this supplemental production contains multiple terabytes of data including thousands of hours of video footage of the January 6, 2021 events at the United States Capitol.

96.     Counsel will be unable to review thousands of hours of video footage and will certainly be unable to provide any meaningful access to those discovery materials to Mr. Mink.

97.     If Mr. Mink was released on conditions set by this Honorable Court, he would be able to have meaningful access to and ability to review the Rule 16 materials provided to date by the Government.

## IV.   MR. MINK'S PRE-TRIAL DETENTION SUBJECTS HIM TO ABUSIVE AND INHUMANE TREATMENT AND CONDITIONS

98.     While detained at Central Detention Facility, Mr. Mink has endured multiple instances of being served "food" that is inedible, rotten, or both.  The inedible foods that he has been served include rotten fruit, and food substance that tastes and smells like detergent.

99.     Even when the food is not technically inedible or rotten, it is not uncommon for Mr. Mink to be served medieval style prison meals consisting of only bread and cheese, or only "sweat meat" with no bread.

100.    While detained at Central Detention Facility Mr. Mink has been exposed to black mold on multiple occasions.

101.    While detained at Central Detention Facility, Mr. Mink has not been able to access any manner of in-person or video visitations with his family.

WHEREFORE, in light of all of the foregoing, the Defendant, Jorden Mink, respectfully requests that this Honorable Court grant the within Motion and enter an Order vacating Magistrate Judge Lenihan's January 29, 2021 order of detention.

Respectfully submitted,

Dated: October 26, 2021

/s/ Michael E. Moser
Michael E. Moser, Esquire
PA ID No. 78844
Law Office of Michael Moser
2661 Clearview Road - Suite 8
Allison Park, Pennsylvania 15101
(412) 753 0400
mike@moserslaw.com
memoser@comcast.net

-22-