**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-cr-25 (RDM)** |
| | : | |
| **JORDEN ROBERT MINK,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION FOR**
**REVOCATION OF DETENTION ORDER**

On October 27, 2021, the defendant, Jorden Robert Mink (hereinafter the "defendant"),

filed a Motion for Revocation of Detention Order (under seal),[1] requesting the release of the

defendant following the January 29, 2021 detention order issued by U.S. Magistrate Judge Lisa

Pupo Lenihan in the Western District of Pennsylvania, at which time the court found by clear and

convincing evidence that no condition or combination of conditions of release will reasonably

assure the safety of any other person and the community.   Order of Detention (Exhibit A).  The

only significant change in circumstances since the detention hearing is that the defendant was

charged on February 24, 2021, with three additional felonies by way of a superseding indictment.[2]

Accordingly, and for the reasons set forth below, the government requests that the defendant's

motion be denied.

---

[1] On November 2, 2021, the Court instructed the defendant to file a redacted version of its motion on ECF, which was done on November 9, 2021.  Also, on November 8, 2021, the Court ordered the government to respond to the defendant's motion by November 12, 2021.

[2] The superseding indictment added the following three felony offenses: Count Eight: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Count Nine: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); and Count Ten: Assaulting, Resisting, or Impeding Certain Officers 18 U.S.C. §§ 111(a)(1).

# I.     BACKGROUND

## A.     The Attack on the U.S. Capitol on January 6, 2021

On January 6, 2021, a joint session of the U.S. Congress convened at the U.S. Capitol.  The U.S. Capitol is secured 24 hours a day by U.S. Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.  Only authorized people with appropriate identification are allowed access inside the Capitol.  On that day, the exterior plaza of the Capitol was also closed to members of the public.  During the joint session, elected members of the U.S. House of Representatives and the U.S. Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020.  The joint session began at approximately 1:00 pm.  Shortly thereafter, by approximately 1:30 pm, the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 pm, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of the USCP, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 pm, members of the House of Representatives and Senate, including the President of the Senate, Vice President Mike Pence, were instructed to— and did—evacuate the chambers.  Accordingly, the joint session of Congress was effectively suspended until shortly after 8:00 pm.  Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

During the violent riot, numerous individuals were involved in assaults against law enforcement officers, which occurred both inside of the Capitol, as well as on the steps outside of the Capitol and the grounds of the Capitol.  Some of these assaults resulted in injury to officers who were attempting to protect the U.S. Capitol and the individuals inside of the building. While a number of the individuals who assaulted officers were unarmed, others were armed with weapons including bats, sticks, poles, stun guns, and chemical spray.  The defendant, as detailed below, is charged with destroying government property, stealing government property, and assaulting officers with a dangerous weapon, specifically with a long pole, as well as other assaultive behavior and related crimes.

**B.       The Defendant's Conduct on January 6, 2021**

On the afternoon of January 6, 2021, the defendant willingly and enthusiastically participated in several key moments during the attack on the U.S. Capitol Building.  He engaged in destructive and assaultive behavior, much of which was captured on publicly posted videos as well as surveillance video and body worn cameras (BWC).  The defendant first appears on the west side of the Capitol in front of a large crowd.  As the crowd chants and cheers, the defendant climbs onto an exterior window ledge of the Capitol armed with a baseball bat.  He then proceeds to violently and repeatedly strike a window with the bat, causing the window to shatter and fall into the building.  The defendant enters the building through the broken window as do other

members of the crowd. He removes property from the interior of the Capitol, to include a chair,

delivering it into the hands of people in the crowd on the exterior of the building. The broken-out

window permits other members of the crowd to enter the Capitol, and further damage and steal

property within the building. They can be seen removing property, including a lamp and drawers,

through the same window shattered by the defendant. The defendant repositions himself on the

window ledge and then uses the bat, to again, violently and repeatedly strike an adjoining window,

until it too shatters.[3] While standing on the window ledge, he defiantly turns his back to the Capitol

and raises the bat above his head in a victorious manner as members of the crowd cheer. He also

appears to be taking video of the crowd with a red cell phone.

Below are screenshots of publicly posted videos showing the defendant using a baseball

bat to shatter a window at the Capitol, and stealing a chair from within the Capitol:



---

[3] The USCP assessed that the value of the damage caused to the above-described windows exceeds $1,000.



The defendant then makes his way to the nearby West Terrace entrance of the U.S. Capitol, where officers from the USCP and Metropolitan Police Department (MPD) (who were assisting USCP) had formed a defensive line within the entrance tunnel to physically prevent the large crowd of protesters from entering the Capitol building.  The officers, who are wearing riot gear, are easily identifiable as members of USCP and MPD by lettering on their equipment.

Over the course of the next couple of minutes, the defendant appears just outside the entrance and engages in escalating assaultive conduct.  He is not acting alone.  He is acting in concert with multiple members of the crowd, who are standing alongside the defendant and engaging in similar assaultive conduct.  The defendant, while holding an American flag (in his left hand) and a red cell phone (in his right hand), angrily yells and spits at the officers guarding the door.  He then proceeds to hurl multiple objects at the group of officers – including a traffic cone, a large rectangular-shaped object (possibly a step or drawer), and stick-like objects.  He then appears armed with a long pole (likely a flagpole), which he uses to violently and repeatedly strike the officers at the entrance, hitting their shields at least five times.  The pole appears to break after the last strike.  After a few minutes, in an apparent reaction to smoke or pepper spray, the crowd

temporarily retreats backward 15 to 25 feet from the entrance, allowing the officers to exit the Capitol building and respond to the protestors.

In a screenshot from one of the videos, the defendant is visible (as depicted below) as being just outside the guarded entrance, holding a flag and a cell phone.  Moments before this screenshot, another member of the crowd attempted to spray the officers with a fire extinguisher.  The defendant then stepped forward and spit at the officers.



Below are four stills taken from a video, showing additional assaultive conduct.[4]  In Photo Still 1, the defendant is clearly visible just outside the Capitol building entrance, defiantly facing the officers while wearing a black hat.  In Photo Still 2, the defendant is holding a large orange cone above his head, moments before launching it at the group of officers guarding the entrance. In Photo Still 3, a large rectangular-shapes object (possibly a step or drawer) can be seen in the air, heading toward the group of officers after being thrown by the defendant.  In Photo Still 4, the

---

[4] These stills and the underlying videos, which show repeated assaultive conduct on the part of the defendant, were not available to the U.S. magistrate judge at the time of the January 29, 2021 detention hearing.

defendant is seen with a long pole in his hand, which he uses to violently and repeatedly strike the officers.

Photo Still 1:                              Photo Still 2:



Photo Still 3:                              Photo Still 4:



### C.      The Subsequent FBI Investigation and Arrest of Defendant

A review of the defendant's social media, including his Instagram account, revealed a self-taken photo of the defendant at the Lincoln Memorial in Washington, D.C. that is dated January 3, 2021.  An earlier post from what appears to be November 3, 2020 (the date of the presidential election), shows a self-taken photo of the defendant holding a firearm that has sticker that says, "I Voted."  The commentary to the post reads, "The ballot is stronger than the bullet – Abraham Lincoln.  "Well … my magazines will be fully loaded just in case it's not."   Below are screenshots of these Instagram posts:



On January 18, 2021, U.S. Magistrate Judge Robin M. Meriweather issued a complaint and arrest warrant, charging the defendant for his participation in the January 6, 2021 attack on the U.S. Capitol.[5]  On that same date, the defendant was arrested in the Pittsburg area away from his residence and a search warrant was executed at his residence in Pennsylvania.

---

[5] The complaint charged the defendant with the following specific offenses: (1) Unlawful Entry on Restricted Building or Grounds While Using or Carrying a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a) and (b)(1)(A); (2) Unlawful Injury to Property on Capitol Grounds, in violation of 40 U.S.C. § 5104(d); (3) Violent Entry, Disorderly Conduct, and Physical Violence on Capitol Grounds, in violation of 18 U.S.C. §§ 5104(e)(2)(D), (F), and (G); (4) Destruction of Government Property over $1,000, in violation of 18 U.S.C. § 1361; (5) Theft of Government Property, in violation of 18 U.S.C. § 641; and (6) Aiding and Abetting, in violation of 18 U.S.C. § 2(a).

The Federal Bureau of Investigation (FBI) recovered evidence corroborating the defendant's presence at the U.S. Capitol, including clothing – i.e., jacket and hat, which matched the clothing worn by the defendant on January 6, 2021 on the Capitol grounds and is depicted in the above images.  The FBI also located an FBI-issued wanted poster (as seen below), in the defendant's vehicle at the time of his arrest.  The wanted poster seeks information on people involved in the January 6th riot, and includes images of ten suspected rioters, including the defendant, who appears at the bottom right of the poster.



The presence of the wanted poster in the defendant's possession indicates that he was aware that he was a subject of an FBI investigation.  At no time did he attempt turn himself in to the FBI.

In fact, his post-January 6th actions demonstrate an attempt to obstruct or impede the investigation. For example, the red cell phone that he had in his possession on January 6th and used to take video at the Capitol mysteriously disappeared. It was not recovered on his person, in his vehicle, or at his residence.  He coincidentally purchased a new cell phone shortly after January 6th.[6]   Also, in the days before his arrest, the FBI began to conduct surveillance on the defendant.  He was aware of the surveillance, as noted in text communications with his girlfriend that were recovered after his arrest.  He advised his girlfriend that he was under surveillance and instructed her to delete videos that he had taken (although it is not clear if he was referring to videos of the surveillance or videos taken at the Capitol on January 6th).

Finally, at the time of the defendant's arrest, the FBI recovered a loaded .45 caliber handgun from his persons and two loaded magazines for a .223 caliber rifle from his vehicle.  The ammunition appears consistent with the weapon depicted in the defendant's Instagram post of November 3, 2020, in which he is holding what appears to be an AR-15 type rifle with an "I voted" sticker.  The rifle was not recovered during the search.[7]   In addition, the FBI confirmed that the defendant unsuccessfully attempted purchase another firearm on January 9, 2021, just three days after engaging in the above-described destructive and assaultive conduct at the U.S. Capitol.[8]

---

[6] The defendant's girlfriend testified at the detention hearing on his behalf, and she had no explanation for what happened to the defendant's red cell phone, or why he purchased a new one, and had not seen the red cell phone "since that night."  Transcript of Detention Hearing, dated January 29, 2021, at 64-65, ln 23-25 and 1-8 (Exhibit B).

[7] The girlfriend claimed at the detention hearing that she believed the rifle was stolen from the defendant's residence by a family member.  Transcript, at 63, ln 1-3.

[8] The investigation revealed that the defendant also unsuccessfully attempted to purchase a firearm in August 2020.

### D.        Procedural History Since the Defendant's Arrest

On January 27, 2021, the defendant was indicted in this case by a federal grand jury, which charged him with: _Count One_ – Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; _Count Two_ – Theft of Government Property over $1,000, in violation of 18 U.S.C. §§ 641 and 2; _Count Three_ –  Destruction of Government Property over $1,000, in violation of 18 U.S.C. §§ 1361; _Count Four_ –  Entering and Remaining on a Restricted Building or Grounds While Using or Carrying a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a) and (b)(1)(A); _Count Five_ –  Disorderly Conduct in a Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(D); _Count Six_ –  Act of Physical Violence in the Capitol Grounds or Building, in violation of 18 U.S.C. § 5104(e)(2)(F); _Count Seven_ – Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 18 U.S.C. § 5104(e)(2)(G).

On January 29, 2021, a fulsome detention hearing was held in the Western District of Pennsylvania.  At the end of the hearing, which included the presentation of evidence by both parties (including the calling of a witness each), the magistrate found "[b]y clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community," and the defendant was ordered detained pending trial. Order of Detention, dated January 29, 2021 (Exhibit A).

 On February 24, 2021, a federal grand jury returned a superseding indictment, which included the following additional felony offenses: _Count Eight_ – Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); _Count Nine_ – Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); and _Count Ten_ – Assaulting, Resisting, or Impeding Certain Officers 18 U.S.C. §§ 111(a)(1).

On or about October 27, 2021, the defendant filed a motion for revocation of the detention order. The Court ordered the government to respond by November 12, 2021.

## II.    LEGAL STANDARD

The Court can reconsider pretrial detention at any time before trial if the judicial officer finds that "information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f)(2); *United States v. Bikundi*, 73 F. Supp. 3d 51, 54 (D.D.C. 2014). In other words, the statute requires that a movant provide information that is both "new" and "material." *See United States v. Lee*, 451 F. Supp. 3d 1, 5 (D.D.C. 2020).

Previously available information—even if "material"—is not grounds to reopen a detention hearing. *See Lee*, 451 F. Supp. 3d at 5. And any "new" information is only "material" if it is "essential to, or capable of significantly affecting, the detention decision." *United States v. Worrell*, 2021 WL 2366934 at *9 (D.D.C. June 9, 2021); *see also Lee*, 451 F. Supp. 3d at 5 (stating that, for purposes of reopening a detention hearing, information has a "material bearing" on detention if it "casts different light on any of [the Bail Reform Act] factors," and citing Black's Law Dictionary (11th ed. 2019), which defines "material" as "[h]aving some logical connection with the consequential facts" or "[o]f such a nature that knowledge of the item would affect a person's decision-making; significant; essential.")). As noted in the introduction, the only information not available to the magistrate judge at the detention hearing, bearing on the defendant's detention, that is both new and material, is the fact that the defendant is facing three additional felony charges by way of a superseding indictment and the full factual basis for those

12

charges.  This information does not support the defendant's motion for release, rather it further substantiates the magistrate judge's order for detention.

Under the Bail Reform Act, the government may move for detention if a charged offense falls under one of the five enumerated categories within 18 U.S.C. § 3142(f)(1)(A) – (E) or if the defendant poses a serious risk of flight or of attempting to obstruct justice or threaten, injure, or intimate a juror, as cited within 18 U.S.C. § 3142(f)(2)(A)-(B).  *See also United States v. Chrestman*, 525 F.Supp.3d 14, 21 (D.D.C. 2021).

In this case, the government moved for detention based on the defendant's danger to the community and his risk of flight.  Under § 3142(f)(1), a charge of 18 U.S.C. § 1361 (destruction of government property), as charged in the indictment and the superseding indictment, and a charge of 18 U.S.C. §§ 111(a)(1) and (b) (assaulting, resisting, or impeding certain officers using dangerous weapon), as charged in the superseding indictment, are considered crimes of violence. "Crime of violence" is defined in 18 U.S.C. § 3156(a)(4) in part as "(A) an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another or (B) any other offense that is a felony and that, by its nature, involves substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Thus, both violations fall within the statute.

To justify detention based on dangerousness, the government must prove by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."  18 U.S.C. § 3142(f); *United States v. Munchel*, 991 F.3d 1273, 279-80 (D.C. Cir. 2021).  To justify detention based on risk of flight, the government must demonstrate the appropriateness of detention by a preponderance of the evidence. *United States v. Xulam,* 84 F.3d 441, 442 (D.C. Cir. 1996).

In determining whether there are any conditions or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of any person in the community, the Court considers the following factors: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *see United States v. Bikundi*, 47 F. Supp. 3d 131, 133 (D.D.C. 2014); *United States v. Hong Vo*, 978 F. Supp. 2d 41, 43 & n.1 (D.D.C. 2013).

## III.   ARGUMENT

### A.   Factors Enumerated in 18 U.S.C. § 3142(g)

#### i.   Nature and Circumstances of the Offense

The nature and circumstances of this offense weigh in favor of detention.  In *Chrestman,* this Court articulated a set of factors for evaluating the nature and circumstances of offenses committed at the Capitol, and how those factors bear on detention.  525 F. Supp. 3d 14 at 26-27. Those factors include whether the defendant: (1) is charged with felony offenses, or solely with misdemeanors; (2) engaged in prior planning for his criminal conduct before arriving at the Capitol; (3) carried or used a dangerous weapon at the Capitol; (4) coordinated with other participants before, during, or after the riot; (5) assumed a formal or *de facto* leadership role with respect to the riot; and (6) injured, attempted to injure, or threatened injury to others; damaged or attempted to damage property; actively threatened or confronted law enforcement officers; or promoted or celebrated efforts to engage in such conduct.  Id.  As this Court noted:

> Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. These factors measure the extent of

a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

Id.

In this case, the defendant is charged with multiple felonies, including, but not limited to, violations of 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding), 18 U.S.C. § 1361 (destruction of government property), 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers), and 18 U.S.C. §§ 111(a)(1) and (b) (assaulting, resisting, or impeding certain officers using a dangerous weapon).  The defendant's participation in the January 6th riot was not a single, spontaneous, or impulsive act.  Rather, it was willful, repeated, and escalatory in nature. He made his intent clear in a November 2020 Instagram post, in which he made a threat on the day of the presidential election.  He followed through on this threat by traveling from the Pittsburg to Washington, D.C. in January 2021, and then positioning himself at the front of the raucous crowd outside the Capitol on January 6th, where he used a baseball bat to shatter two windows to the Capitol.[9]  This allowed him and other members of the crowd to enter the building and steal government property.  The defendant was not done, even after raising the bat toward the crowd in a celebratory manner.  He again positioned himself at the front of the crowd at a nearby entrance to the Capitol, where he, alongside other members of the crowd, engaged in escalatory assaultive behavior directed at the officers guarding the entrance – yelling, spitting, hurling objects, and then using a pole to strike the officers until it broke.

---

[9] One video shows the defendant strike the first window more than fifty times with a bat before it shatters and falls into the Capitol building.  Another video shows the defendant strike the adjoining window with the same bat more than ten times before it too breaks and falls into the building.

The defendant acknowledges in his motion the seriousness of the offenses charged. Defendant's Motion for Revocation of Detention Order, at 10 [ECF # 38], and the magistrate judge at the detention hearing, who did not have the benefit of the full nature of the defendant's assaultive behavior, best captured the seriousness of the offenses: "This was a horrendous crime against our democracy that [the defendant] not only participated in, but was a very active and violent participant, and maybe even a leader." Transcript, at 84, ln 16-18. The magistrate judge further noted the defendant "put members of our government in fear of their lives by his actions." *Id,* ln 22-23.

In sum, the defendant's actions that day demonstrated escalating violent behavior, from destroying and stealing government property and obstructionism, to attempting to gravely injure law enforcement officers at the Lower West Terrance tunnel.

### ii.        Weight of the Evidence Against the Defendant

This factor weighs in favor of detention. The evidence in this case is overwhelming.[10] The video evidence alone against the defendant includes videos taken from the public on January 6, 2021, surveillance footage of the defendant, as well as BWC footage. The videos not only depict the defendant conducting the above-described actions but also provide compelling evidence of identification. The defendant is easily identifiable in the videos by his face as well as by his distinctive tattoos. In addition, witnesses have come forward and identified the defendant from stills taken from these videos, and the defendant made admissions to one of the witnesses about his participation in the January 6th riot, and specifically, about damaging a window at the Capitol.

---

[10] The defendant concedes that "the weight of the evidence is substantial," Defendant's Motion, at 11. [ECF # 38], and the magistrate judge at the detention hearing noted of the evidence that, "It's extremely strong." Transcript, at 83, ln 85.

The FBI investigation further corroborated the defendant's involvement and role in the attack on the Capital. A search of the defendant's social media revealed a November 3, 2020 Instagram post, in which he appears armed with an AR-15-style rifle while conveying a threat about the election. A search of the defendant's residence resulted in the recovery of the clothing the defendant wore on January 6th (and which he is depicted wearing in the above-described videos/stills). A search of the defendant's vehicle resulted in the recovery of two loaded rifle magazines (consistent with the AR-15-style rifle depicted in November 2020 Instagram post) and an FBI wanted poster of the January 6th event depicting the defendant. In addition, the FBI recovered a loaded handgun from the defendant's persons at the time of his arrest and learned that he attempted to purchase a firearm on January 9, 2021, just three days after the attack on the Capitol.

### iii.   History and Characteristics of the Defendant

This factor weighs in favor of detention. The defendant's motion accurately reports the criminal record but minimizes the risk posed by the defendant. The pre-trial service report reflects a lengthy criminal record, which shows arrests and convictions, throughout the defendant's adult life, including a conviction for simple assault. The report further reflects the defendant's complete disregard for the rule of law in his two failures to appear in 2012 and for committing a criminal offense while on probation in 2014. The magistrate made note of these infractions, and further noted, while commending the defendant on his pre-arrest sobriety, that the drug addiction "is a risk factor, having that in your history." Transcript, at 85, ln 7-11. The defendant was also unemployed for the three months preceding his arrest.[11]

████████████████████████████████████████████████

---

[11] Another fact that bears insight into the defendant's character and priorities is that on January 9, 2021, while having been unemployed for more than two months, the defendant attempted to purchase a firearm.



Another telling factor of the defendant's character are his actions after becoming aware of the FBI investigation.  It is clear the defendant was aware that he was a subject of an FBI investigation.  He had in his possession an FBI wanted poster of the January 6th event, which depicted his image.  The FBI also recovered text communications with his girlfriend about the FBI surveillance of him prior to his arrest.  Upon learning of the investigation, the defendant did not turn himself in to law enforcement, rather, he took steps to frustrate the investigation by getting rid of the phone he used to take video at the Capitol on January 6th and by instructing his girlfriend to delete videos once he became aware of the surveillance.  At the detention hearing, the magistrate found that the defendant "did attempt to obstruct justice simply because your phone has now mysteriously disappeared, and I think that there is an issue that you may obstruct justice moving forward if you were released."  Transcript, at 86, ln 15-18.

### iv.     Nature and Seriousness Posed by the Defendant's Release

This factor weighs in favor of detention.  As noted above, this was not an isolated incident. The defendant has a long criminal history, which includes a conviction for simple assault and a disregard for the court's authority (either through failures to appear or by committing a crime while on probation).  In the months before the January 6th attack, the defendant posted a threat on Instagram.  It was more than an idle threat.  The defendant appeared armed with an AR-15 style

18

rifle, and in January 2021, he traveled to D.C. and made good on his threat.  He was at the forefront of the attack on the Capitol and committed repeated acts of violence on the Capitol and the officers guarding it.  His actions enabled others to enter the Capitol building, steal government property, and further obstruct the certification proceedings.  When he returned home, he got rid of his phone and attempted to purchase a firearm.  When he was arrested, he was in possession of a loaded handgun.  The pre-trial services report noted that had two other handguns, both of which are reportedly in the possession of his mother.  The AR-15 style rifle, however, was never recovered, and this is particularly concerning since (despite his girlfriend's claim that it was stolen by a family member): (1) it was displayed during his threatening November 2020 Instagram post, and (2) he was in recent possession of it (as evidenced by the November 2020 post and the recovery of loaded magazines in his vehicle at the time of his arrest).  Moreover, at the detention hearing, the magistrate judge noted (even with an incomplete record as to the defendant's assaultive conduct), "The fact that you were involved in this crime against our democracy and that you engaged in a violent attack on the United States Capitol, evidence is to me nothing but a complete and total disregard for the Government and for the rule of law."  Transcript, at 86, ln 19-22.

The defendant attempts to justify his release by citing numerous other Capitol Riot cases in which release was granted.  These cases are factually inapposite.  While each detention determination is a fact-bound inquiry that must be made individually, *United States v. Khater*, 856 Fed. Appx. 322, 323 (D.C. Cir. July 26, 2021), the D.C. Circuit in *Munchel* notably drew a distinction between violent and non-violent participants in the Capitol riots, with the former being in a "different category of dangerousness."  991 F.3d at 1284.  In fact, the court in *Munchel* specifically named those who assaulted police officers as falling into the category of elevated dangerousness.  Id.  Other courts in this district have made the same observation. *See United States*

*v. Fairlamb*, No. 1:21-CR-120-RCL, 2021 WL 1614821, at \*5 (D.D.C. Apr. 26, 2021) ("Indeed, if any crime establishes danger to the community and a disregard for the rule of law, assaulting a riot-gear-clad police officer does."). The defendant's actions demonstrated "a willingness to use violence—even against law enforcement—to achieve his political aims" indeed, he "sought out conflict with law enforcement by making his way to the front lines," then took actions that "were intended to injure law enforcement officers." *United States v. Fitzsimons*, No. 21-cr-158, 21 WL 4355411, at \*7 (D.D.C. September 24, 2021). "Such egregious conduct reflects the depths of his disregard for the safety of others, for our democratic institutions, and for the rule of law." Id. (internal citations omitted).

**B. The Defendant has not Demonstrated that the Conditions at Correctional Treatment Facility (CTF) Justify his Release.**

The defendant's claims regarding access to discovery and the conditions at CTF do not establish that he is entitled to the relief he seeks. To be sure, the defendant is entitled to reasonable access to discovery and the opportunity to meaningfully confer with counsel. But the defendant cites no authority suggesting that his complaints justify reopening the detention hearing and ordering his release. Indeed, the concerns raised by the defendant are entirely independent of the factors this Court must analyze in making a detention decision under the Bail Reform Act.

According to CTF, pursuant to its protocols, its inmates are permitted to review and possess hard copy discovery material (i.e., documents, photographs, etc.), and that electronic discovery material can be reviewed during attorney-client visits or on a CTF laptop. CTF advised that due to the limited number of CTF laptops, they are provided to inmates on a rotating basis for a two-week period.

On May 4, 2021, the government provided defense counsel with the discovery items most directly relevant to the defendant, consisting of approximately 300 items of discovery, including

FBI reports, search warrants materials, videos, photographs, social media records, and a grand jury transcript.  Shortly, thereafter, the defense notified the Court that the defendant was having difficulty accessing the discovery.  In a collaborative effort on the part of CTF, defense counsel, and the government, the defendant was provided extended access to a laptop (which was more than likely at the expense of other inmates), so that he could complete a review of this material. The parties also worked together to resolve technical and other related issues to ensure a timely review of the discovery material.  Despite the government's efforts to assist in the defendant's review of the discovery, it is worth noting that defendant's access to a laptop is immaterial to the question of whether he would pose a danger if released.

On September 1, 2021, the government produced supplemental discovery to the defendant, consisting of additional video footage and images acquired through the broader Capitol Riot investigation.  This material is also directly relevant to the defendant; however, it is a significantly smaller amount of material than provided in May 2021.  The parties have reached out to CTF in an attempt to expedite the defendant's access to this material.  In October 2021, the government provided the defendant with a series of global discovery productions.  These productions are large; however, the vast majority of the material is relevant to the larger Capitol Riot investigation rather than to any particular Capitol Riot defendant or subject and is being provided to the majority of the Capitol Riot defendants at large.  This bucket of discovery material which is largely irrelevant to the defendant is the thousand of hours of video footage referenced in the defendant's motion.

Finally, the defendant's complaint about the conditions at CTF does not warrant his release.[12]

---

[12] These matters can be taken up with CTF staff, and if proven to be true and unresolvable, the option exists to change detention facilities.

## CONCLUSION

On January 29, 2021, after a fulsome detention hearing and examination of the factors enumerated in 18 U.S.C. § 3142(g), the magistrate judge correctly found that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community and ordered the defendant detained pending trial.  The record today makes for a more compelling argument for detention.   For the reasons stated herein, the United States respectfully requests that the Court deny the defendant's motion to revoke the detention order.


Respectfully submitted,


MATTHEW M. GRAVES
United States Attorney
D.C. Bar. 481052

By:      */s/ Michael C. DiLorenzo*
Michael C. DiLorenzo
Assistant United States Attorney
(MD Bar No. 931214 0189)
United States Attorney's Office
National Security Section
555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: (202) 252-7809
Email: michael.dilorenzo@usdoj.gov


## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of this pleading to be served upon defense counsel, Michael Moser, Esq., this 12th day of November 2021, via ECF.


/s/   *Michael C. DiLorenzo*
Michael C. DiLorenzo
Assistant United States Attorney