**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA** :
:
: **Case No: 21-CR-25 (RDM)**
:
**v.** :
:
**JORDEN ROBERT MINK** :
**Defendant.** :

**STATEMENT OF OFFENSE**

1. The Government respectfully submits the following Statement of Offense in support of a plea of guilty by defendant JORDEN ROBERT MINK (hereinafter "defendant MINK") to Count Nine of the Superseding Indictment in the above-captioned matter, which charges a violation of Title 18, United States Code, Sections 111(a)(1) and (b) (Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon) and Count Two of the Superseding Indictment, which charges a violation of Title 18, United States Code, Section 641, 2, (Theft of Government Property).

**Elements of the Offense**

2. The essential elements of the charged offense of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b), each of which the Government must prove beyond a reasonable doubt, are that:

a. the defendant forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any person designated in section 1114 of this title while engaged in or on account of the performance of official duties;[1]

b. the acts in violation of this section involve physical contact with the victim of that assault or the intent to commit another felony; and

c. that in the commission of any acts described above, the defendant used a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicted bodily injury.

3. The essential elements of Theft of Government Property, in violation of 18 U.S.C. § 641 are that:

a. the defendant embezzled, stole, purloined, or knowingly converted to his use or the use of another a thing of value of the United States or of any department or agency thereof; and

b. the thing(s) of value and a value over $1,000.00.

**Evidence of the Offense**

4. If this case were to go to trial, the government would prove the following facts beyond a reasonable doubt:

Background

5. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include

---

[1] Section 1114 defines designated persons as "any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance" and would include officers from the United States Capitol Police (USCP) and other persons, to include non-federal police officers, assisting them in the performance of their official duties. 18 U.S.C. § 1114.

permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

6. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

7. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

8. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

9. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted

to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

10. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $2.7 million dollars for repairs.

11. Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

Evidence of MINK's Conduct

12. On January 6, 2021, after entering the Capitol Building through a broken window, MINK exited the building and used a baseball bat to break a different window at the Capitol

Building, and thereafter removed property from the interior of the Capitol, to include chairs, delivering the property into the hands of people in the crowd on the exterior of the building. Other individuals can be seen handing out property such as a lamp and drawers through the same window after it was shattered by MINK. MINK also struck an adjoining window repeatedly with a baseball bat, in an apparent attempt to shatter it.

13. Below are screenshots of publicly posted videos showing MINK using a baseball bat to shatter a window at the Capitol:



*Figure 1*

14. A review of MINK's social media, including an Instagram account entitled, "tattedup_badison," includes a self-taken photo of MINK at the Lincoln Memorial in Washington, D.C. that is dated January 3, 2021. An earlier post from what appears to be November 3, 2021, shows a self-taken photo of MINK holding a firearm that has sticker that says, "I Voted." The commentary to the post reads, "The ballot is stronger than the bullet – Abraham Lincoln. "Well … my magazines will be fully loaded just in case it's not." Below are screenshots of these Instagram posts:



*Figure 2*



*Figure 3*

15. The USCP assessed that value of the damage caused to the above-described windows exceeds $1,000.

16. On January 18, 2021, MINK was arrested in the Pittsburg area away from his residence, pursuant to a criminal complaint issued in the District of Columbia. On that same date, a search warrant was executed at his residence in Oakdale, Pennsylvania. Agents recovered items corroborating MINK's presence at the U.S. Capitol, including clothing – i.e., jacket and hat, which matched the clothing worn by MINK in Figure 1 above which was taken on the Capitol grounds on January 6th. In addition, an FBI wanted poster (as seen below), was located

in MINK's vehicle. The wanted poster seeks information on people involved in the January 6th riot, and includes images of ten suspected rioters, including the image identified as MINK.




17. The FBI obtained additional video footage, from the lower west terrace entrance of the U.S. Capitol, which is in close proximity to the area of the above-described broken out window, showing MINK on the Capitol grounds and engaged in assaultive conduct. The video footage – which was obtained from a collection of police body worn cameras, Capitol surveillance, and open source videos shows officers from USCP and the Metropolitan Police Department (MPD) (who were assisting USCP) within the Capitol building at a western entrance, wearing riot gear – including helmets and shields. The officers, who are easily identifiable as members of USCP and MPD by lettering on the back of their equipment, are

physically preventing a large crowd of protesters from entering the Capitol building. Several members of the crowd can be seen yelling, assaulting, and throwing various items – including sticks, bottles, books, and traffic cones – at the officers. In a screenshot from one of the videos, MINK is visible (as depicted below) as being just outside the entrance of the lower west terrace, holding a flag and a cell phone.




18. Over the course of the next couple of minutes, MINK engages in assaultive conduct. He spits at the officers guarding the door and then throws several objects at them – including a traffic cone, a large rectangular-shaped object (possibly a step or drawer), and a stick. MINK then appears armed with a long pole, which he uses to violently and repeatedly strike at the officers at the entrance, hitting their shields at least five times. After a few minutes, in an apparent reaction to smoke or pepper spray, the crowd temporarily retreats backward 15 to 25 feet, allowing the officers to exit the lower west terrace area and respond to the protestors.

19. Below are four stills taken from a video, showing the assaultive conduct. In Photo Still 1, MINK appears just outside the lower west terrace entrance with his face clearly visible, facing the officers and wearing a black hat. In Photo Still 2, MINK is seen holding a large orange cone above his head, moments before throwing it at the group of officers. In Photo Still 3, a large rectangular-shaped object (possibly a step or drawer) can be seen in the air, heading toward the group of officers after being thrown by MINK. In Photo Still 4, MINK is seen with a long pole in his hand. He uses the pole to violently and repeatedly strike at the officers.

Photo Still 1: Photo Still 2:



Photo Still 3: Photo Still 4:




20. This statement of offense is a summary of MINK's conduct and is not intended to be a complete accounting of all facts and events related to the offenses charged in this case. The limited purpose of this statement of offense is to demonstrate that a factual basis exists to support MINK's guilty plea to the offense of Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, as charged in Count Nine of the Superseding Indictment, as well as Count Two of the Superseding Indictment, which charges a violation of Title 18, United States Code, Section 641, 2, Theft of Government Property.

Respectfully submitted,

MATTHEW GRAVES
United States Attorney for the
District of Columbia

/s/
Barry K. Disney
(KS Bar No.13284)
U.S. Attorney's Office

DEFENDANT=S ACKNOWLEDGMENT

I have read this factual proffer and have discussed it with my attorney, Komrod J. Maknoon. I fully understand this factual proffer. I agree and acknowledge by my signature that this proffer of facts is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this factual proffer fully.

Date: 1-9-2023

Jorden Robert Mink
Defendant

ATTORNEY'S ACKNOWLEDGMENT

I have read this factual proffer, and have reviewed it with my client fully. I concur in my client's desire to adopt this factual proffer as true and accurate. To my knowledge, my client=s decision to agree to and adopt this factual proffer is an informed and voluntary one.

Date: 1-9-2023

Komron J. Maknoon
Counsel for the Defendant