UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 21-CR-25 (RDM) |
| JORDEN ROBERT MINK | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jorden Mink to 64 months' incarceration, three years of supervised release, $2000 in restitution, the mandatory $125 special assessment ($25 for each A misdemeanor and $100 for each felony). A sentence of 64 months is at the midpoint of the 57-71 month guideline range estimated by the parties in the plea agreement. [1]

## I.    INTRODUCTION

The defendant, Jorden Mink, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election,

---

[1] As set forth in detail below, in the guilty plea agreement, the parties estimated that the sentencing guideline range is 57 to 71 months' incarceration. Guilty Plea Agreement, Doc. 78, p. 4. The United States Probation Office has estimated that the sentencing guideline range is 51 to 63 months' incarceration. PSR ¶ 112.

injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

On January 6, 2021, Mink joined the riotous crowd near the Lower West Tunnel. As the crowd chanted and cheered, Mink climbed onto an exterior window ledge of the Capitol armed with a baseball bat. Mink proceeded to violently and repeatedly strike a window with the bat, causing the window to shatter and fall into the building. Mink then entered the Capitol through the window and removed property, to include chairs, delivering them to rioters on the exterior of the building. Still on his violent rampage, Mink continued his journey and assaulted police officers in the Lower West Tunnel, by spitting on them, throwing items at them, and repeatedly striking them with a flagpole. Mink intended to be violent on January 6, 2021. Prior to his journey to Washington D.C., Mink posted on his Facebook, "'The ballot is stronger than the bullet' – Abraham Lincoln. Well … my magazines will be fully loaded just in case it's not!"

The government recommends that the Court sentence Mink to 64 months' incarceration for his convictions of violating 18 U.S.C. § 111(a) and (b) and 18 U.S.C. § 641. This sentence reflects the gravity of his crimes.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

---

[2] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

ECF 79, for a short summary of the January 6, 2021 attack on the United States Capitol by

hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

2020 presidential election.

### Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.[3]

One of the most violent confrontations on January 6 occurred near an entrance to the

Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually

consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction

of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that

was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with

glass.  On the other side of the two sets of swinging doors is a security screening area with metal

detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The

exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the

West Front of the Capitol Building.  This archway is also of great symbolic significance as it has

been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and

---

Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

is the entrance for the President-Elect and other dignitaries on Inauguration Day. *See* Image 1; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Image 1**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police ("USCP"), assisted by officers from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob

for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."[4]

---

[4] Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers.  The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.  Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle.[5]

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor.  MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most

---

[5] *Id.* (Statement of Sgt. Aquilino Gonell).

> inspirational moment of my life. The bravery he and others showed that day are the
> best examples of duty, honor, and service.[6]

Several officers sustained injuries during this prolonged struggle, and many returned to defend the

Capitol, even when injured, as substantial reinforcements for these officers did not arrive until

heavily armored Virginia State Police officers joined the police line with additional munitions

around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to

injured rioters who were trapped in the tunnel area, including those who had difficulty breathing

as a result of chemical irritants that had been used in the tunnel area.  It is not an exaggeration to

state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the

lives of others, including potential harm to members of Congress.

### Injuries and Property Damage Caused by the January 6, 2021 Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a

grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021).

Members of this Court have similarly described it as "a singular and chilling event in U.S. history,

raising legitimate concern about the security—not only of the Capitol building—but of our

democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10,

2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc.

41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and

myself for what we view as an incredibly dangerous and disturbing attack on a free electoral

---

[6] *Id.* (Statement of Officer Michael Fanone)

system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See Id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S.

Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), available at https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8 million dollars.

### B.     Jorden Mink's Role in the January 6, 2021 Attack on the Capitol

*Mink's Social Media Posts Leading up to January 6*

Mink prepared for violence before going to the Capitol on January 6. On November 3, 2021, Mink posted on his Instagram account entitled, "tattedup_badison," with a photo of him holding a firearm that had a sticker on it which said, "I Voted." ECF 79 at ¶ 14. He commented on that same post and said, "The ballot is stronger than the bullet" – Abraham Lincoln. "Well … my magazines will be fully loaded just in case it's not." *Id. See also* Image 2. On January 3, 2021, Mink followed up on this statement and posted a photo of himself by the Lincoln Memorial

announcing that he arrived in DC.



*Image 2 – Mink's Social Media Post on November 3, 2021*

*Mink Destroys Property*

On January 6, Mink began his violent escapade as soon as he was on restricted grounds. While near the Lower West Terrace, Mink used a baseball bat to smash open the window to a room within the Capitol building. *See* Images 3 and 4. [7] Mink went inside the ST-2M room of the Capitol building, stole chairs, and delivered these items to other rioters in the crowd on the exterior. ECF 79 at ¶ 12; *See also* Image 5. Mink's action of smashing this window gave other rioters access this room. *Id.* These rioters were also able to give the crowd on the exterior lamps and drawers through the same window Mink smashed. *Id.* Relentless in his violent escapade, Mink then attempted to

---

[7] Images 3 and 4 are still images of open source video where Mink smashed the window. This video will be provided to the court via USAfx as Exhibit 1.

shatter an adjoining window with a baseball bat but was unsuccessful. *Id.*



*Images 3 and 4 - Mink smashes window with a baseball bat*



*Image 5 - Mink holding a stolen chair*

*Mink Assaults Officers*

Mink continued his violent rampage on the Lower West Terrace entrance of the restricted grounds by assaulting officers of the United States Capitol Police (USCP) and the Metropolitan Police Department (MPD). ECF 79 at ¶ 17. These officers were wearing riot gear and were physically preventing this large mob from entering the Capitol building through the Lower West Terrace tunnel. *Id.* In a screenshot from a video, Mink is seen outside of the entrance, holding a flag and a cell phone.[8] *See* Image 6. While he was outside the Lower West Terrace, Mink spat on officers guarding the doors and threw several objects at them – including a traffic cone, a large rectangular-shaped object (possibly a step or a drawer) and a stick. *Id.* at ¶ 18. Mink did not stop there. Mink then took a pole and used it to violently and repeatedly strike officers in front of this entrance. Still images from videos depict Mink's violence against these officers below. *See* Images 7 to 10. Open source video also depicts Mink striking these officers with a pole. *See* Exhibit 4.[9]

---

[8] This still image is from a video of Mink spitting on officers. The video will be submitted to the Court via USAfx as Exhibit 2.

[9] Exhibit 4 is a video of Mink's assaultive conduct on officers and will be submitted to the Court via USAfx.



*Image 6: Mink holding flag*



*Image 7: Mink spits on officers*          *Image 8: Mink throws orange cone at officers*



*Image 9: Mink throws rectangular-shaped object      Image 10: Mink uses pole against officers*

## III.    THE CHARGES AND PLEA AGREEMENT

On February 24, 2021, a federal grand jury returned a superseding indictment charging Jorden Mink with Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count One); Theft of Government Property, in violation of 18 U.S.C. § 641 (Count Two); Destruction of Government Property, in violation of 18 U.S.C. § 1361 (Count Three); Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count Four); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Five); an Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Six); Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Seven); Civil Disorder, in violation of 18 U.S.C. 231(a)(3) (Count Eight);

14

Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count Nine); and Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (Count Ten).

On January 17, 2023, Jorden Mink was convicted of those offenses based on a guilty plea entered pursuant to a plea agreement.

## IV.    STATUTORY PENALTIES

Mink now faces sentencing for Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b) (Count Nine), and Theft of Government Property, in violation of 18 U.S.C. § 641 (Count Two).[10]

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office ("USPO"), for Count Two, Mink faces up to one year imprisonment, one year of supervised release, five years of probation, a maximum fine of up to $100,000, $2,000 in restitution, and a special assessment of $25. For Count Nine, Mink faces up to 20 years' imprisonment, three years of supervised release, five years of probation, a maximum fine of up to $250,000, $2,000 in restitution, and a special assessment of $100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). In the guilty plea agreement, the parties estimated the guidelines as follows:

---

[10]   In the guilty plea agreement, the government agreed that it will move to dismiss the remaining counts at sentencing; however, agreed that the charges were based in fact. ECF 78, p. 2, section 4.

<u>Count Nine: Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| | Specific Offense Characteristics: | |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous weapon otherwise used | +4 |
| U.S.S.G. § 2A2.2(b)(7) | Convicted under 18 U.S.C. §111(b) | +2 |
| | Applicable Adjustments: | |
| U.S.S.G. § 3A1.2(a) & (b) | Official victim | +6 |
| | Adjusted Offense Level (Subtotal) | 26 |

<u>Count Two: Theft of Government Property in violation of 18 U.S.C. § 641 and 2</u>

| | | |
|---|---|---|
| U.S.S.G. § 2B1.1(a) | Base Offense Level | 6 |
| | Adjusted Offense Level (Subtotal) | <u>6</u> |

<u>Grouping Analysis</u>

In the plea agreement, the parties agreed that Count Nine, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, and Count Two, charging  Theft of Government Property, are grouped because they are two or more acts or transactions connected by a common criminal objective or constituting a common scheme or plan. U.S.S.G. § 3D1.2(b).

| | | |
|---|---|---|
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | -3 |
| | Total Offense Level | <u>23</u> |

*See* Guilty Plea Agreement (ECF 78) at ¶¶ 5(A).

The United States Probation Office's calculation of the Offense Level is identical, except that the USPO found that Counts 2 and 9 do not group, because they involve separate harms under U.S.S.G. § 3D1.2; however, the USPO also found that the multi-count adjustment was 0, pursuant to U.S.S.G. § 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than the Group

with the highest offense level"). Accordingly, the USPO and the parties agree that the Total Offense Level is 23. PSR ¶ 58; Guilty Plea Agreement (Doc. 78), p. 3.

Criminal History Category

In the guilty plea agreement, the parties agreed that Mink had "at least" five prior convictions (listed in the agreement) as a result of which he was estimated to be in Criminal History Category III.  Guilty Plea Agreement (Doc. 78), p. 4. The USPO subsequently determined that Mink had six prior convictions, but calculated that Mink has 3 criminal history points and so in criminal history category II.[11] PSR ¶ 67. The government has objected to the USPO's calculation of the criminal history score and asks this Court to find that Mink's criminal history score is 4, and that he therefore is in Criminal History Category III.

In addition to his juvenile adjudications set forth in the PSR, which do not result in any criminal history points, Mink has the following criminal convictions, as noted in the PSR:

---

[11] In the signed plea agreement (ECF No. 78 at 4), Mink acknowledged "that after the pre-sentence investigation by the United States Probation Office, a different conclusion regarding … criminal convictions and/or criminal history points may be reached … and may increase or decrease." At the time of the plea agreement, the government was unaware of Mink's Disorderly Conduct conviction in 2014 (offense #4 in the table below). Similarly, the government mistakenly thought that Mink's 2013 conviction was for possession of drug paraphernalia/marijuana, not disorderly conduct (offense #1 in the table below).

| | Date sentence imposed | Offense(s) | Sentence | PSR | Govt's Position |
|---|---|---|---|---|---|
| 1 | 1/16/2013 | Plea agreement: Possession of Drug Paraphernalia; Possession of Marijuana. PSR: Disorderly Conduct; purchase of alcohol by minor; investigation by officer/duty of operator; signal improper | Plea agreement: Fines and cost. PSR: Count One (Disorderly Conduct): time served (7 days' imprisonment); as to the remaining counts, no further penalty. | PSR ¶61 0 points | 0 points |
| 2 | 12/10/2013 | Simple Assault; Theft by Unlawful Taking: Moveable Property | Count One (simple assault): 6 months' probation; Count Two Unlawful taking): no further penalty | PSR ¶ 2 1 point | 1 point |
| 3 | 3/11/2014 | DUI: General Impairment (BAC: .08-.10) | 6 months' probation | PSR ¶ 3 1 point | 1 point |
| 4 | 9/2/2014 | Disorderly Conduct | Fines and costs | PSR ¶ 4 0 points | 0 points[12] |
| 5 | 5/16/2018 | DUI: Highest Rate of Alcohol (BAC: .10-.16) | 60 days' intermediate punishment program and 6 months' probation | PSR ¶ 5 1 point | 1 point |
| 6 | 10/1/2020 | Criminal Trespass | Fines and costs | PSR ¶66 0 points | 1 point |
| **Total** | | | | **3 points** | **4 points** |

[12] In the government's objections to the PSR (ECF 84), the government argued that the defendant's 2014 conviction for disorderly conduct should receive one point. Upon further review, the government withdraws this argument.

In its objections to the PSR (ECF 84), the government stated that the criminal history score in the draft PSR section for Criminal History Computation, at ¶ 67, should be five, which establishes a criminal history category of III. Upon further review, the government submits that the criminal history score should be four. The government noted that the draft PSR fails to assign a point for the conviction of Criminal Trespass in 2020 (offense 6 above). ECF No. 82 at ¶ 66. The PSR cites specifically to Guidelines Section 4A1.2(c)(1) as the reason for giving Mink a score of zero on this offense. *See* ECF No. 82 at ¶ 66. Section 4A1.2(c)(1) provides that sentences for certain misdemeanor offenses – including trespassing – are not counted unless "the prior offense was similar to an instant offense."  Mink's offense conduct on January 6, 2021, is similar to his 2020 offense of trespassing. Therefore, this offense should be given a score of one.[13] This would then change Mink's total criminal history score to four and his criminal history category to III (for 4, 5, or 6 criminal history points).

Additionally, the Guidelines provides that an upward departure may be warranted "if reliable information indicates that the defendant's criminal history substantially underrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(a)(1). Based on the guidelines and the defendant's criminal history, we submit that an upward departure is warranted. The draft PSR states that the defendant

---

[13]  Concerning the 2013 disorderly conduct conviction, the PSR states that "Court records reflect a Possession of Marijuana and Use/Possession of Drug Paraphernalia offenses for which the defendant pled to [a] lesser charge." PSR 61. The PSR cites the additional details of the offense, which involved a car stop and the recovery of marijuana in a pill bottle and a scale. Given the nature of this offense, the government does not contend that this offense should be counted as a "disorderly conduct" offense under U.S.S.G. § 4A1.2(c)(2).

has been found guilty of six different adult criminal acts from 2012 to 2020. ECF No. 82 at ¶ ¶ 61-66. The defendant also committed the criminal acts in the instant offense less than a year after he was convicted for Criminal Trespass in 2020. Although juvenile adjudications do not count towards assigning criminal history points, his history shows a clear pattern of criminal behavior since 2008. The defendant continues to exhibit a clear disregard for the law, and a criminal history category of II does not adequately represent his history and clear pattern of criminal behavior.

<u>Advisory Guideline Range</u>

With an Offense Level of 23 and a Criminal History Category of III, the resulting guideline range is 57 to 71 months' incarceration.[14]

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Mink's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Mink smashed open a window in the Capitol, enabling him and other rioters to enter the Capitol. Mink stole chairs from inside the Capitol and passed them out to other rioters. Mink then went to the Lower West Terrance tunnel, where he repeatedly struck

---

[14]  With an Offense Level of 23 and a Criminal History Category of II, as calculated by the USPO, the resulting guideline range is 51 to 63 months' incarceration.  PSR ¶ 112.

officers with a pole, spat on them, and threw things at them. The nature and circumstances of Mink's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 64 months' imprisonment.

**B.  The History and Characteristics of the Defendant**

Mink, age 29, has a significant history of arrests and convictions, beginning at age 15 in 2008 and continuing to age 26 in 2020. His prior adjudications and convictions are for criminal mischief, disorderly conduct, simple assault, theft by unlawful taking, driving while intoxicated, and trespass.

Mink's crimes on January 6 were not an isolated event in an otherwise law-abiding life. They came, instead, after a long series of offenses. His history and characteristics, including his history of arrest and conviction for violent assaults and history of violent rhetoric, weigh heavily in favor of a lengthy term of incarceration.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Mink's criminal conduct, assaulting law enforcement officers, breaking into the Capitol, stealing items from the Capitol, and providing these items to an angry mob was the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

***General Deterrence***

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[15] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.  Mink has a criminal history category of III and his conduct on January 6, 2021 was egregious. To date, there has been no indication that Mink has any remorse for his actions on January 6, 2021. The combination of his criminal history and his egregious conduct on January 6, warrant a serious sentence to deter him from committing future crimes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing

judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[17]

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Gardner*, 21-cr-622-APM, the defendant, like Mink, engaged in violent conduct on the Lower West Terrace. Gardner attempted to shatter the same window Mink later smashed, entered the same ST-2M room of the Capitol building, assaulted officers on the Lower West Terrace with weapons, and handed items of furniture to other rioters in the crowd while encouraging these rioters to use the items against officers. However, unlike Mink, Gardner did not have an extensive criminal history (criminal history category of I) and was ultimately sentenced to 55 months' imprisonment. Mink's conduct coupled with his extensive criminal history warrants a longer sentence.

In *United States v. Palmer*, 21-cr-328-TSC, the defendant, like Mink, assaulted multiple law enforcement officers in the Lower West Terrace. While in the area, Palmer threw wooden items at officers and sprayed a fire extinguisher at them. Unlike Palmer, however, Mink also used a baseball bat  to smash open a window of the Capitol and then entered the building, from where he handed out items that other rioters used as weapons against police. Unlike Mink, Palmer's criminal history category was a I. For assaulting law enforcement officers with a dangerous or deadly weapon, Palmer was sentenced to 63 months' imprisonment for violating Sections 111(a) and (b). Mink's conduct warrants a longer sentence.

25

In *United States v. Mazza*, 21-cr-736-JEB, the defendant was sentenced to 60 months incarceration for violations of 111(a) and (b). Mazza also used a weapon to assault an officer, but he did not steal property or cause additional damage to the Capitol building. Again, Mink's conduct accordingly warrants a longer sentence.

While no one case is the perfect comparator, the cases above illustrate that the government's requested sentence – 64 months' incarceration – is comparable to individuals who harm law enforcement, obstruct justice, and engaged in prolonged acts of violence. The sentence is just, necessary, and for the purposes of §3553(a)(6), warranted.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, the government did not identify any officer who suffered bodily injury as a result of Mink's assaultive

conduct. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Mink] must pay $2,000 in restitution, which reflects in part the role Mink played in the riot on January 6.[18] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of April 2022 (this figure has since been revised to $2,881,360.20 as of October 2022). Mink's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 149.

---

[18] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 64 months' imprisonment, three years of supervised release, $2000 in restitution, the mandatory $125 special assessment ($25 for each A misdemeanor and $100 for each felony).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:    *Nialah S. Ferrer*
_____
Nialah S. Ferrer
Assistant United States Attorney
New York Bar No. 5748462
601 D Street, NW
Washington, D.C. 20530
(202) 557-1490
Nialah.Ferrer@usdoj.gov